Entered on Docket April 16, 2018

**Below is a Memorandum Decision of the Court.**

*Mary Jo Heston*
_____
**Mary Jo Heston**
**U.S. Bankruptcy Judge**
**(Dated as of Entered on Docket date above)**

___

# UNITED STATES BANKRUPTCY COURT
# WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| In re:<br><br>JASON LANCE BUNGE,<br><br>      Debtor. | Case No. 17-44245<br><br>**MEMORANDUM DECISION ON DEBTOR'S OBJECTION TO CLAIM OF SOUND CREDIT UNION (CLAIM 1)** |

This matter came before the Court on March 22, 2018, on the objection of the debtor Jason Bunge ("Debtor") to the claim of Sound Credit Union ("Sound CU"). The Court considered the documents in the record, the arguments of counsel, and otherwise being fully advised denies the objection in part.

## **BACKGROUND**

The Debtor filed his Chapter 13 bankruptcy petition on November 15, 2017. On November 17, 2017, creditor Sound CU filed a proof of claim indicating that it was owed a total of $39,238.66 secured by a motor vehicle with a value equal to the amount of the claim. (Claim 1-1). The Sound CU claim also indicates that the collateral is "910 Collateral," shorthand for a claim that is not subject to modification to reduce the claim to the value of the collateral under

MEMORANDUM DECISION - 1

Case 17-44245-MJH   Doc 34   Filed 04/16/18   Ent. 04/16/18 11:19:33   Pg. 1 of 9

the hanging paragraph of 11 U.S.C. § 1325(a)(*).[1] According to the documents in the record, the Debtor purchased a 2016 Ford Fusion on March 27, 2017, for a price of $39,955.46. (Bunge Dec., ECF No. 27-1). The retail installment contract indicates that the Debtor agreed to make 96 monthly payments of $507.66, including interest at the rate of 5.04%, with the first payment due May 11, 2017. As part of the purchase, the Debtor traded in a 2006 Dodge Ram 3500 with negative equity of $5,001.75. The Debtor also chose to finance an $895 GAP contract and a $2,895 service contract using funds provided by Sound CU.[2] The purchase of the vehicle occurred 233 days prior to the filing of the bankruptcy petition.

The Debtor objected to the Sound CU claim and sought a reduction of the secured portion of the claim by $5,001.75 for negative equity based on a vehicle trade-in, $895 for GAP insurance, and $3,167.13 for a vehicle service contract with United Car Care. The claim objection indicated that the Debtor desired to cancel the contracts. Jeffery Girmus, Member Solutions Manager at Sound CU, filed a letter with the Court indicating Sound CU's opposition to the claim objection and also providing copies of both the GAP and service contracts. Sound CU did not appear at the hearing but the Court informed Debtor it would deny the objection as to the GAP and service contracts without prejudice for the reasons already articulated by Chief Judge Brian D. Lynch in a published decision.[3]

On February 9, 2018, the Debtor re-filed the Sound CU claim objection along with a supporting memorandum of points and authorities. The Debtor also provided a slightly more legible copy of the retail installment contract as part of his declaration in support of the claim

---

[1] Unless otherwise indicated, all chapter, section and rule references are to the Federal Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.
[2] The Debtor indicates that Lakewood Ford initially negotiated the contract but subsequently assigned its interest to Sound CU. Generally, assignment of a security interest does not destroy its purchase money security status. Trejos v. VW Credit, Inc. (In re Trejos), 374 B.R. 210, 215-16 (9th Cir. BAP 2007). Therefore, the Court uses Sound CU and Lakewood Ford interchangeably.
[3] See In re Aase, 17-42519-BDL, ECF No. 30 (Bankr. W.D. Wash. Jan. 11, 2018).

objection. Sound CU did not file a response to the second claim objection. Neither the original nor the amended claim objection addresses the value of Sound CU's collateral.

## **DISCUSSION**

The Debtor objects to the secured amount of Sound CU's claim on a variety of grounds in an attempt to avoid application of anti-cramdown provision of § 1325(a)(*) and allow reduction of the secured portion of Sound CU's claim. First, Debtor argues that the Court must sustain his objection because it is unopposed and Sound CU has failed to meet its burden to prove a purchase money security interest ("PMSI"). Second, the optional nature of the GAP and car care contracts exclude these items from the purchase price of the vehicle and, therefore, the PMSI portion of Sound CU's claim. The third and final argument, raised for the first time at the hearing, is that as separate agreements, the GAP and service contracts give Sound CU a non-PMSI secured claim in the value of the contracts and not in the value of the vehicle. There is no dispute that the collateral for the Sound CU claim is a motor vehicle acquired with 910-days of the petition date and for the personal use of the debtor as necessary for the provisions of § 1325(a)(*) to apply to the claim. At the hearing, Debtor's counsel confirmed that the retail installment, GAP, and service contracts are typical of the agreements filed in this district. Therefore, the Debtor's claim objection raises a legal question for the Court as to whether the anti-modification language of § 1325(a)(*) covers GAP and service contracts offered through the dealership at the time of the vehicle purchase.

A. <u>The Court has authority to evaluate the merits of an unopposed claim objection.</u>

The Debtor's first argument is that the Court should sustain the objection by default because Sound CU failed to oppose the claim objection. In the alternative, the Debtor argues that it is Sound CU's burden to prove the extent of its PMSI claim under state law and that Sound CU failed to meet its burden to prove a PMSI interest as to the GAP and service

contracts. See In re Hayes, 376 B.R. 655, 673 (Bankr. M.D. Tenn. 2007). The Debtor also requests that the Court strike the letter filed by Sound CU filed in opposition to the first claim objection as an impermissible pleading of an unrepresented corporation. The Court declines the Debtor's request to strike the letter as unnecessary, since it is undisputed that Sound CU did not respond to the Debtor's second claim objection. Instead, the Court considers only the copies of the GAP and services contracts to the extent these documents are offered merely as supplements to the proof of claim.[4]

When a party fails to respond in a contested matter, the court's local bankruptcy rules provide discretion to grant the relief requested. Local Rules W.D. Wash. Bankr. 9013-1(f). Granting an unopposed motion "is not an empty exercise but requires that the court find merit to the motion." See Nunez v. Nunez (In re Nunez), 196 B.R. 150, 156-57 (9th Cir. BAP 1996). A court's exercise of its discretion to refuse to sustain an unopposed motion is to find that the relief requested has no basis in the applicable law. See In re Meyer, 373 B.R. 84, 96 (9th Cir. BAP 2007) (vacating the granting of an unopposed motion where granting the relief requested would offend the rules of bankruptcy). "Critical review of uncontested motions, moreover, is consistent with a basic legal principle—that courts are not required to grant a request for relief simply because the request is unopposed." In re Franklin, 210 B.R. 560, 562 (Bankr. N.D. Ill. 1997). "'The public expects, and has a right to expect, that an order of a court is a judge's certification that the result is proper and justified under the law.'" In re Pace, 569 B.R. 264, 269 (6th Cir. BAP 2017) (quoting In re Delaware River Stevedores, 147 B.R. 854, 869-70 (Bankr. E.D. Pa. 1992)).

The Debtor also argues that Sound CU has the burden to affirmatively demonstrate a PMSI interest. Although the court agrees that a creditor has the burden of proving the extent of

---

[4] The Debtor references the GAP and service contracts in the objection but did not introduce either into the record. Since the Debtor does not dispute the authenticity of the supplemental documents filed by Sound CU the Court considers these documents as part of the creditor's claim for purposes of this decision.

MEMORANDUM DECISION - 4

any PMSI interest, it is unclear what more the Debtor expects Sound CU to offer in this case. See RCW 62A.9A-103(g); In re Vega, 344 B.R. 616, 622 (Bankr. D. Kan. 2006) (secured party has burden of proof to show the money loaned made it possible for debtor to obtain collateral and that the funds were in fact so used). The Debtor does not contest any of the information contained in the proof of claim and supporting documents, such as the dates of execution or the breakdown of the sale price financed through the dealership. It is undisputed that the price of both the GAP contract and the service contract constituted part of the amount financed through funds provided by Sound CU and that the Debtor entered into the agreements within 910 days of the petition date. The documents speak for themselves. The sole issue for the Court is whether the transaction is of the nature contemplated by § 1325(a)(*), a legal determination in this instance. Therefore, the Court will not sustain the objection on the basis that it is unopposed.

### B. Sound CU's purchase money claim includes amounts for optional GAP and service contracts entered into at the same time as the vehicle purchase.

The Debtor's main legal argument in support of sustaining the objection to claim is that Sound CU's PMSI extends only to the funds enabling the Debtor to purchase the 2016 Ford Fusion and not to the optional contract amounts. According to the Debtor, the optional nature of the purchase of GAP insurance and a service contract prevents the creation of a PMSI protected under § 1325(a)(*). This is a misstatement of the law.

The Bankruptcy Code provides special protection for PMSI claims secured by motor vehicles where the debtor purchases the vehicle in the 910-day period preceding the petition. § 1325(a)(*); Americredit Fin. Servs., Inc. v. Penrod (In re Penrod), 611 F.3d 1158, 1161 (9th Cir. 2010) (Penrod II). [5] To determine what qualifies as a "purchase money security interest,"

---

[5] In full, the Code protects debts secured by personal property from cramdown where "the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day

courts look to the law of the state governing the transaction. Penrod II, 611 F.3d at 1161 (citing Butner v. United States, 440 U.S. 48, 54-57 (1979)).

The Sound CU retail installment agreement was executed in Lakewood, Washington, and the contract provides that both federal law and the laws of Washington State govern the transaction. Washington State has adopted most of the provisions in Article 9 of the Uniform Commercial Code, including the definitions applicable to purchase money security interests. Under Washington law, a security interest in goods is a purchase money security interest, "to the extent that the goods are purchase-money collateral with respect to that security interest." RCW 62A.9A-103(b)(1). "Purchase money collateral" means "goods or software that secures a purchase money obligation incurred with respect to that collateral." RCW 62A.9A-103(a)(1). Finally, a "purchase money obligation" is "an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire right in, or the use of, the collateral, if the value is in fact so used." RCW 62A.9A-103(a)(2). The comments to RCW 62A.9A-103 indicate that a purchase money security interest "requires a close nexus between the acquisition of collateral and the secured obligation." RCW 62A.9A-103, Cmmt. 3.

In this case, Sound CU provided the funds enabling the Debtor to purchase the 2016 Ford Fusion and enhance the value of that purchase through the service contract. Through the financing of GAP insurance, the Sound CU funds also allowed the Debtor to protect against a deficiency should a total loss of the vehicle occur. Both the GAP insurance and service contracts were executed on the same day the Debtor purchased the Ford Fusion, and both agreements were incorporated into the retail installment agreement and disclosed as part of the total amount financed. In fact, the GAP insurance was only available for purchase on the same date that the

---

period preceding the date of the filing of the petition, and the collateral for that debtor consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing." § 1325(a)(*).

Debtor acquired the vehicle and, like the service contract, was only available as to that particular vehicle. (GAP Addendum at ¶ "Limitation," ECF No. 18). In essence, but for the purchase of the vehicle, the Debtor would not have sought an extension of credit to purchase a 2016 Ford Fusion, a GAP contract with Equity Protect, and a service agreement with United Car Care, Inc.

The Debtor argues that the GAP and service contracts were optional agreements with third parties and, therefore, the contracts cannot constitute part of the "price" of acquiring the vehicle. Relying on Penrod II and a bankruptcy case from Tennessee, the Debtor focuses on the meaning of "price" for purposes of a purchase money obligation. Penrod II, 611 F.3d at 1162-63; In re Hayes, 376 B.R. at 671. The Court does not agree that either case controls the outcome here.

In Penrod II, the Ninth Circuit affirmed a decision that negative equity was not part of the "price" of a vehicle purchase because the antecedent nature of the pre-existing debt negated any "new value" argument under the statute. Penrod II, 611 F.3d at 1161. Penrod II did not actually address items like Gap and service contracts offered at the time of sale. Interestingly, as part of its analysis of whether negative equity was part of the "price" of the vehicle purchase, the Ninth Circuit Bankruptcy Appellate Panel ("BAP") noted that Regulation Z did not include negative equity in the definition of the "cash price" of a consumer sale. In re Penrod, 392 B.R. 835, 850 n.18 (9th Cir. BAP 2008) (Penrod I). However, the language quoted by the BAP does indicate that the "cash price" may additionally include the "price of accessories, services related to the sale, service contracts and taxes and fees for license, title, and registration." Penrod I, 392 B.R. at 850 n. 18 (quoting 12 C.F.R. § 226.2(a)(9) (2007)); Wells Fargo Fin. Acceptance v. Price (In re Price), 562 F.3d 618, 628 n. 5 (4th Cir. 2009) (gap insurance part of the purchase price and therefore part of the PMSI). Even the Official Comments to the U.C.C. recognize that the "price" of the vehicle includes things such as "expenses of collection and enforcement, attorney's fees, and other similar obligations" that are more a part of an overall package sale

rather than the direct cost of the vehicle. U.C.C. § 9-103, Official Comment 3; <u>Graupner v. Nuvell Credit Corp. (In re Graupner)</u>, 537 F.3d 1295, 1301-02 (11th Cir. 2008).

The language of § 1325(a)(*) appears to speak more to a traditional vehicle sale, instead of a hyper-technical limitation based on the collateral financed. Contrast the language of § 1325(a)(*) with the language protecting claims secured by a debtor's principal residence. The Code prevents cramdown of a residential mortgage claim if "the last payment on the original payment schedule for a claim **secured only** by a security interest **in real property** that is the **debtor's principal residence** is due before the date on which the final payment under the plan is due . . . ." § 1322(c)(2). If Congress intended a restrictive definition of sales involving motor vehicle, it could have just used the phrase "secured only by" when referring to the motor vehicle.

All aspects of the Sound CU retail installment agreement indicate that the GAP and service agreements came about as part of the transaction of purchasing the Ford Fusion. In fact, the retail installment agreement indicates that the purchaser of the vehicle consented to a security interest in the vehicle and all "insurance, maintenance, service, or other contracts we finance for you." (Bunge Dec., ECF No. 27). The "close nexus" discussed in the comments to RCW 62A.9A-103 appears satisfied as to add-on contracts executed at the time of the sale. Similar to a roof rack, underbody coating, or other items that a debtor decides to include with a vehicle at the time of purchase, the contracts at issue here are part of the vehicle purchase and directly related to the vehicle. The court in <u>Penrod I</u> characterized the antecedent debt as outside of the PMSI transaction because it was simply the second creditor paying off the first creditor's unsecured deficiency and did not provide any new value as required to fit within the definition of a PMSI. <u>Penrod I</u>, 392 B.R. at 849. This is not the case with the GAP and service contracts purchased by the Debtor and financed by Sound CU. Given the history of § 1325(a)(*), it seems unlikely that Congress intended for the bankruptcy court to go line-by-line through a vehicle purchase agreement and pick out all of the optional additions apparently typical in

vehicle purchases.[6] For these reasons, the Court determines that the protection from modification in § 1325(a)(*) extends to the GAP and service contracts in this case.

Since there is no dispute as to the Debtor's ability to cramdown the negative equity portion of the Sound CU claim, the Court will sustain the claim objection as to the negative equity component of the claim as required by Penrod II.

/ / / End of Memorandum Decision / / /

---

[6] "Based upon the legislative history, there is little doubt that the 'hanging-sentence architects intended only good things for car lenders and other lienholders.'" In re Long, 519 F.3d 288, 294 (6th Cir.2008) (quoting Keith M. Lundin, CHAPTER 13 BANKRUPTCY, 3d ed. 451.5–1 (2000 & Supp.2007–1)); In re Duke, 345 B.R. 806, 809 (Bankr.W.D.Ky. 2006) ("The history [of the hanging paragraph] does indicate that it was meant to discourage bankruptcy abuse. It is interesting to note that the section of BAPCPA that added the hanging paragraph was entitled, 'Section 306-Giving Secured Creditors Fair Treatment in Chapter 13 ... Restoring the Foundation for Secured Credit.' ").